# Owen v. McGehee et als.

# McGehee v. Owen.

### Bill for Contribution, &c.

1. *Surety; what creates the relation of.*—Where parties desiring to purchase parts of a tract of land, of unequal quantities, but not inequal in value except as to the difference in quantity, procure one of them to purchase the entire tract in his name, they joining in the note for the purchase-money— all are jointly and severally bound as principals to the vendor; but as between themselves, each is principal only for the share of the purchase-money he was bound to pay, and a surety for the remainder.

2. *Contribution; right to.*—The right to contribution, where one, dis-

[Owen v. McGehee, and McGehee v. Owen.]

charges more than his just share of a common burden, does not necessarily arise from contract, but has its foundation in natural justice; the principle applies not only to the relation of principal and surety, but to that of original contractors, and whenever parties stand in a relation in which equality of burdens is equity between them.

3. *Same; right to share in benefits acquired by person bound to contribute to another.*—Wherever persons stand in such relation to a common burden, that contribution between them will be compelled, neither can speculate on the common liability, and whatever benefits or advantages are acquired by one in dealings with the common creditor, enure equally to the benefit of all.

4. *Same.*—A co-surety who gives his individual note to the common debtor, who accepts it in payment and compromise of the debt, is entitled to contribution from the other sureties for their *pro rata* share, though he afterwards became insolvent, and failed to pay the note to the common debtor.

5. *Contribution, delay in enforcing; when not bar to.*—Contribution may be refused to a surety, when his conduct has been such as to work injustice or injury to the principal or co-sureties; but when injury has not been produced by delay, and lapse of time has not worked a bar, mere passiveness in asserting his right, will not prejudice a claim to contribution.

APPEAL from Chancery Court of Lowndes.
Heard before Hon. H. AUSTILL.
The opinion states the case.

DAVID CLOPTON, for Owen.

ELMORE & GUNTER, for McGehee.

BRICKELL, C. J.—These are cross-appeals from a decree rendered by the court of chancery, in a cause wherein the appellant, Owen, was complainant in the original bill, and defendant in a cross-bill filed by the appellee, McGehee.

The purpose of the original bill is to compel contribution from McGehee, for the relief of Owen, who has discharged more of a common obligation than he was bound in equity and conscience to discharge, thereby benefitting McGehee. The facts as shown by the pleadings and proof are, that in December, 1859, the personal representatives of Haley Hutchinson, under an order of the court of probate of Lowndes county, exposed to public sale, a large tract of land, containing more than fourteen hundred acres. Owen, McGehee, Watts, and Harrison, each desired to purchase parts of the lands, of unequal quantities, neither desiring to purchase the entire tract. On the day of, and at the place of sale, it was agreed that Owen should in his own name bid off the entire tract, and the others would join him in the note for the purchase-money. Each one was to take the part and quantity of the lands he wished, and was to pay a corresponding part

of the purchase-money. The lands were bid off by Owen, at the aggregate sum of 35,459 66-100 dollars, being 25 25-100 dollars per acre, and the note of himself, McGehee, Watts and Harrison, was given payable to the administrators on the first day of January, 1861, with interest from the first day of January, 1860. Owen was by the administrators reported to the court of probate as the purchaser, and the sale to him confirmed by the court. Immediately Owen entered into possession of 434 27-100 acres of the land, the part and quantity he desired to purchase. McGehee took possession of 568 45-100 acres, the part and quantity he wished. Watts of 240, 36-100 acres, and Harrison of 160, 75-100 acres. Some time after the sale, and after each party had taken possession of the lands he desired to purchase, in the spring of 1869, a dispute arose between McGehee and Owen, as to the amount of the purchase-money each should pay. McGehee insisted his part of the lands was less valuable than the parts of the others, and that the agreement was that the lands were to be valued, and each should pay according to the relative value of his lands as compared to the whole. The result of this dispute was that on the 27th of July, 1860, Watts verbally, and without any new consideration, agreed that for his part of the lands he would pay five dollars per acre more than the price per acre at which Owen bid off the lands; and Owen and McGehee agreed in writing, that Watts' part of the land being valued at this increased price, two persons whom they nominated, should make valuation of their parts of the land, and determine the amount of the purchase-money McGehee should pay. This agreement was left in the possession of Watts and was never executed—the valuation was not made by the persons named—from what cause does not appear. At some other time, but when, it does not appear, another agreement in writing was entered into by Owen, McGehee and Harrison, by which it was agreed that appraisers, whom they selected, should value their respective parts of the land, and that each one should pay of the purchase-money according to the valuation. These appraisers determined each one should pay the purchase-money of the parts of the lands he had taken. On the seventh day of May, 1862, Owen paid on the note for the purchase-money of the lands $6,500; on the 19th June, 1862, $13,500; on the 31st March, 1865, $5,041 61-100, making in the aggregate, $25,041 61-100. On the 20th December, 1862, McGehee paid on the note, $10,000, and on the 11th of June, 1863, the further sum of $900, leaving a balance due on the·

note of $8,859 72-100 on that day.   The note by assignment of
the administrators of Hutchinson passed into the possession of
administrators of one Shepherd, and one Slater subsequently
became possessed thereof.   McGehee having advised with
counsel, having some doubt as to whether he could safely
deal with Slater as the owner of the note, and being advised
that he could, entered into negotiations by which he obtained
the note, paying three thousand dollars in cash, stock of a
railroad company, of the nominal value of fifteen hundred
dollars.   This note he has not paid ; but judgment thereon
has been obtained, execution returned no property found,
and he is now insolvent.   The amount due on the original
note for the purchase-money of the lands, on the first of
June, 1856, when McGehee by this transaction obtained it
was $9,733 24-100.   At this time Owen was also negotiating
with Slater for the note.   There is a conflict in his testimony
and that of McGehee, as to whether he refused to join the
latter in taking up the note.   McGehee was subsequently
involved in litigation with one Sutherlin, who claimed some
right or interest in the note, as to the validity of the transac-
tion with Slater ; and he and Owen were both involved in
litigation with the heirs of Hutchinson, as to the validity of
the title to the lands.   In this litigation, however, they were
successful.

Watts and Harrison each failed to pay any part of the
purchase-money of the lands, and in 1867, surrendered to
Owen the parts of the lands they had taken, whereby as be-
tween himself and McGehee, Owen became bound for their
parts of the purchase-money.   The questions at issue, be-
tween the parties, are, *first*, whether Owen shall account for
Watts' part of the lands, at the increased price he agreed to
pay, or only at the same rate per acre at which the whole
lands were originally purchased ; and, *second*, whether Mc-
Gehee can claim the whole amount due on the original note,
when he obtained it from Slater ; or only the amount he paid
in money, and the actual value of the railroad stock ; *third*,
whether the note for fifteen hundred dollars given by him to
Slater, which is unpaid, shall as between Owen and himself,
be computed a payment.

The chancellor directed a reference to the register to state
an account between the parties, on each hypothesis, and a re-
port was made to which each party filed exceptions.   Pend-
ing these exceptions, the parties agreed that the register
should report, and he did report, that assuming McGehee
was entitled to a credit for the balance due on the original

note for the purchase-money of the lands, on the first day of June, 1866, when he acquired it from Slater, Owen would stand indebted to him on that day $670 54-100, and computing interest to the day of the agreement and report, May 7th, 1877, it would be $1,257 19-100. On the hypothesis that McGehee was entitled to a credit only for the cash paid, the actual value of the railroad stock, and his note for fifteen hundred dollars as cash, he would then be indebted to Owen in the sum of $2,248 51-100 on June first, 1866, and computing interest up to May seventh, 1877, $4,215 72-100.

The chancellor was of opinion, that under all the facts of the case, Owen had too long delayed his claim for contribution, and the right to participate in the benefits of the transaction by which McGehee obtained the original note from Slater, and rendered a decree dismissing the original and the cross-bill. The original bill was filed on November 17th, 1875. The litigation with the heirs of Hutchinson was not then finally determined. Each party has appealed and assigned errors.

There is no evidence that there was any inequality in the values of the several parcels of the tract of land, further than may arise from the difference in quantity. Assuming for the present that there was no agreement between the parties as to the amount of the purchase-money each should pay, the implication of the law would be, that each should pay such a portion, as his part of the land bore to the price of the whole tract; or, assuming there was an agreement the respective parcels should be valued, and each should pay the valuation of his part; or that there was an express agreement that each should pay of the purchase-money according to the quantity of his parcel, will not vary the relations subsisting between the parties. A joint note having been given to the vendors for the purchase-money, as to them, all the makers were jointly and severally bound for its entire amount; all were principal debtors. But as between the makers, each was a principal for the share of the purchase-money he was bound to pay, and a surety for the remainder.—Brandt on Suretyship, § 250; *Deitzler v. Michler*, 37 Penn. State, 82; *Stokes v. Hodges*, 11 Rich. Eq. 135; *Hall v. Hall*, 34 Ind. 314; *Crafts v. Mott*, 4 Coms. 603; *Chipman v. Morrill*, 20 Cal. 130; *Goodall v. Wentworth*, 20 Maine, 322; *Fletcher v. Grover*, 11 N. H. 368.

Standing in this relation to each other, there can be no doubt, if McGehee or Owen, either, paid more than his share of the purchase-money, more than as a principal to the other

[Owen v. McGehee, and McGehee v. Owen.]

he was bound to pay, he has a just claim for contribution. The claim or right does not depend on contract. There was a community of burthen for all the purchase-money beyond the amount each was bound to the other to pay as a principal. It is a principle of equity, having its foundation in natural justice, that when one discharges more than his just portion of a common burthen, another who received the benefit ought to refund to him a rateable proportion. The principle applies not only to the relation of principal and surety, but to that of original co-contractors, and whenever parties stand in a relation in which equality of burthen is equity between them—when one ought not to bear the burthen in ease of the others, "as all are equally bound and are equally released," says Judge STORY, "it seems but just that in such a case all should contribute in proportion toward a benefit obtained by all, upon the maxim *qui sentit commodum sentire debet et onus*, and the doctrine has an equal foundation in morals, since no one ought to profit by another's loss when he himself has incurred a like responsibility. Any other rule would put it in the power of the creditor to select his own victim, and upon motives of mere caprice or favoritism, to make a common burden a most gross personal oppression."—1 Sto. Eq. § 493.

What may have been the orignal agreement between the parties, as to the amount of the purchase-money each should pay for the parcel of land taken by him, it is not material to inquire. If it was variant from the subsequent agreements, it was competent for them to alter or modify it subsequently. The agreement by which Owen, McGehee and Harrison submitted to appraisement their respective parcels of the land, with the view of determining the proportion of the purchase-money each should pay, and the award of the appraisers, that the lands of each were of the same value according to the quantity, and each should pay off the purchase-money on that basis, fixed the amount each was bound as principal to pay. When the award of the appraisers is read and construed in connection with the agreement, this is its only fair and legitimate meaning; and if it were not, in the absence of all evidence that there was any inequality of value in the several parcels, and of all evidence of an express agreement that the parties should pay in any other proportion, there could be no equality of burthen between them, on any other basis.

The agreement by Watts to pay a greater price per acre, for his parcel of the lands, than that to be paid for the entire tract, was not perhaps offensive to the statute of frauds, and

may have been binding on him. His whole agreement was in parol, and could be waived or modified by parol.—1 Chit. Con. 155. If he had paid of the purchase-money, according to this agreement, the payment would have enured to the equal benefit of the other parties. But not having paid any part of the purchase-money, and the others standing as his sureties, not for the payment of the purchase-money, according to this subsequent agreement, but according to the quantity of his parcel of land, at the original price, it is not equitable that McGehee should claim that Owen should account for Watts' parcel at such increased price. The evidence does not disclose that it was of any greater value than the other parcels. When he surrendered it to Owen, it was a payment or security operating to the benefit of McGehee and Harrison as his co-sureties with Owen. It is not insisted that there was any agreement that Owen should take the land at the increased price Watts agreed to pay, or in any other manner than as relieving all from that portion of the common burthen Watts ought to have borne, and for which they stood in the relation of his sureties. All that McGehee can equitably claim from Owen, is full indemnity against the liability he had assumed for Watts, and this is afforded him, when he is not required to pay any part of the purchase-money Watts was originally bound to pay. It was never contemplated by either of them to become bound as a surety one to the other, and to Harrison, for the price of the lands Watts by his agreement subsequent to the purchase, promised to pay. If the lands had been of the value Watts agreed subsequently to pay, profiting Owen to that extent, Owen would have been bound to account for it at that value; but that fact not appearing, the equities of the parties are fully satisfied, when the lands are applied to relieve them from their common liability for Watts.

It is undisputed, that prior to the arrangement by which McGehee acquired the note from Slater, Owens' payments were largely in excess of his proportion of the common debt, including as parts of his liability the proportions of Watts and Harrison for which he became liable by taking their several parcels of the land. It is well established, that a surety can not speculate on the common liability of himself and his co-sureties. Whatever of advantages he may acquire in his dealings with the common creditor, enure like securities for the common debt, to the common benefit. It is as unjust, to compel a surety to bear more than his just proportion of the actual, necessary loss, as it is to compel

him to bear the whole burthen of the common debt.—*Blow v. Maynard*, 2 Leigh, 29; *Tarr v. Ravenscroft*, 12 Grat. 642; *Stallworth v. Preslar*, 34 Ala. 505; Brandt, Suretyship, § 250.

McGehee is not entitled to claim of Owen the whole amount of the balance due on the note, when he acquired it from Slater, but simply the amount he really paid. The dealings between him and Slater, was on the footing that the ultimate collection of the claim was doubtful, or could be indefinitely procrastinated, if there was a resort to legal remedies. The railroad stock was not employed in the payment as of its nominal value, but it was accepted as part of the compromise, into which Slater and McGehee entered. This being true, McGehee can not claim that he shall be allowed more for the stock than its real value.—Brandt on Suretyship, § 250. The note of McGehee, though he has not paid it, operated and was received as a payment of the common debt, and entitles him to contribution from Owen, as if it had been money.—Brandt on Suretyship, § 249; *Pinkston v. Taliaferro*, 9 Ala. 547.

The delay of Owen in asserting his claim for contribution is fully accounted for by the litigation in which he and McGehee were involved in reference to the land, if there was a necessity for accounting for it. Contribution may be refused a surety when his conduct has been such as to work injury or injustice to the principal, or to his co-sureties. But mere passiveness in asserting his rights, unless the lapse of time works a bar; a mere want of diligence, can not prejudice him.

In this view of the rights of the parties, they have agreed the balance due Owen from McGehee on the seventh of May, 1877, was $4,215 72-100. The legal title to the lands resides in Owen, and the debt is a lien chargeable on them.

The decree of the chancellor in 576 dismissing the cross-bill must be affirmed. The decree in 575 must be reversed, and the proper decree will be here rendered.

STONE, J., not sitting, having been of counsel.